CLARK STONE COMPANY, INC., Petitioner v. N.C. DEPARTMENT OF ENVIRON-
MENT & NATURAL RESOURCES, DIV. OF LAND RESOURCES and NORTH
CAROLINA MINING COMMISSION, Respondents, APPALACHIAN TRAIL CON-
FERENCE NATIONAL PARKS CONSERVATION ASSOCIATION; UNINCORPO-
RATED ASSOCIATION OF CITIZENS TO PROTECT BELVIEW MOUNTAIN; OLLIE
COX; AND FAYE WILLIAMS, Respondent/Intervenors

No. COA03-526

(Filed 4 May 2004)

**1. Administrative Law— judicial review—standard of review**

The trial court appropriately used the whole record test for assertions that the revocation of a mining permit was unsupported by the evidence and de novo review for assertions that the decision was in excess of authority and made upon unlawful procedure. The contested case petition in this case was filed before the effective date of N.C.G.S. § 150B-51(c).

**2. Mining and Minerals— revocation of mining permit—application of whole record test—evidence supporting findings**

The trial court erred in its application of the whole record test when reversing an agency decision to revoke a mining permit. Contrary to the trial court's conclusion, the findings made by the agency in revoking the permit were supported by substantial,

CLARK STONE CO. v. N.C. DEP'T OF ENV'T & NATURAL RES.

[164 N.C. App. 24 (2004)]

uncontroverted evidence that the mining operation had a significant adverse impact on the Appalachian Trail, a publically owned and federally designated National Scenic Trail.

## 3. Mining and Minerals— revocation of mining permit— authority

The trial court erred by determining that the Department of Environment and Natural Resources lacked authority to revoke a mining permit based on a finding that the mine operation had a significant impact on the Appalachian Trail, a publically owned and federally designated National Scenic Trail. An operation violates the Mining Act when it adversely affects the purposes of a publicly owned park, forest, or recreation area to a significant degree. N.C.G.S. §§ 74-51(d)(7), 74-58.

## 4. Mining and Minerals— revocation of mining permit— procedure

The trial court erred by concluding that a mining permit was revoked upon improper procedure; DENR could have modified the permit had it so chosen, but there was no obligation to do so. N.C.G.S. §§ 74-57, 74-58(a).

## 5. Mining and Minerals— revocation of mining permit—violation of permit terms—willful

The trial court erred by concluding that a mining permit could not be revoked because any violation of the Mining Act was not willful. Petitioner took inadequate steps to properly and effectively address the violation after being put on notice and despite guidance from DENR. That failure cannot be deemed anything other than willful.

## 6. Mining and Minerals— vested rights—revocation of mining permit—permit mistakenly granted

The doctrine of vested rights did not protect a mining permit where the permit was mistakenly issued in violation of an existing statute. Permits mistakenly issued do not create a vested right; moreover, the vested rights doctrine arises from a validly issued permit, while this permit's validity has been specifically and consistently challenged.

Appeal by respondents and respondent/intervenors from order entered 31 December 2002 by Judge Stafford G. Bullock in Superior Court, Wake County. Heard in the Court of Appeals 24 February 2004.

**CLARK STONE CO. v. N.C. DEP'T OF ENV'T & NATURAL RES.**

[164 N.C. App. 24 (2004)]

*Hatch, Little & Bunn, L.L.P., by Harold W. Berry, Jr., A. Bartlett White, and Tina L. Frazier, for petitioner appellee.*

*Attorney General Roy Cooper, by Senior Deputy Attorney General James C. Gulick and Assistant Attorney General Jennie Wilhelm Mau, for respondent appellants.*

*Southern Environmental Law Center, by Donnell Van Noppen, III, and Sierra B. Weaver, for respondent/intervenor appellants Appalachian Trail Conference and National Parks Conservation Association, and Sigmon, Clark, Mackie, Hutton, Hanvey & Ferrell, P.A., by Forrest A. Ferrell, for respondent/intervenor appellants Association of Unincorporated Citizens to Protect Belview Mountain, Ollie Cox, and Faye Williams.*

WYNN, Judge.

The North Carolina Department of Environment and Natural Resources ("DENR") and the North Carolina Mining Commission (collectively hereinafter "Respondents"), together with the Appalachian Trail Conference, the National Parks Conservation Association, the Unincorporated Association of Citizens to Protect Belview Mountain, Ollie Cox and Faye Williams (collectively hereinafter "Respondent-Intervenors") appeal from an order of the trial court reversing a final agency decision by the North Carolina Mining Commission ("the Commission"). In its final agency decision, the Commission upheld the revocation of a mining permit issued by DENR to Clark Stone Company, Inc. ("Petitioner"). Thereafter, the trial court reversed the decision of the Commission.

On appeal to this Court, Respondents and Respondent-Intervenors contend the trial court erred by (I) reversing the decision of the Commission upholding the revocation of Petitioner's permit; (II) concluding that the revocation was not made upon proper procedure; (III) concluding that revocation was improper because it was not willful; and (IV) concluding that the doctrine of vested rights prohibited revocation of Petitioner's permit. For the reasons stated herein, we reverse the decision of the trial court.

The pertinent procedural and factual history of the instant appeal is as follows: Petitioner filed a petition for a contested case hearing in the Office of Administrative Hearings on 10 October 2000. The administrative law judge reviewing the matter thereafter allowed two private, non-profit groups, the Appalachian Trail Conference and the

National Parks Conservation Association, together with the Unincorporated Association of Citizens to Protect Belview Mountain, and neighboring land owners Ollie Cox and Faye Williams to intervene in the case. Petitioner filed a motion for summary judgment, contending there were no genuine issues of material fact and that it was entitled to judgment as a matter of law.

On 9 April 2001, the administrative law judge held a hearing pursuant to Petitioner's motion for summary judgment. The evidence presented at the hearing tended to show the following: In February of 1999, Petitioner applied to DENR for a mining permit to conduct mining operations on land in Avery County, North Carolina. DENR reviewed Petitioner's application and issued a mining permit on 13 May 1999. Petitioner subsequently began preparing the land for mining operations. At the time DENR issued the mining permit, neither DENR nor Petitioner were aware that the mining operation was within visual and audible range of the Appalachian Trail, a publicly owned and federally designated "National Scenic Trail."

On 10 February 2000, Jay Leutze, a resident of the area near the mining site and a member of the Unincorporated Association of Citizens to Protect Belview Mountain, contacted Charles Gardner, the Director of the Division of Land Resources within DENR. Leutze informed Gardner of his concerns about Petitioner's mining operation and its potential impact on the Appalachian Trail. After learning of the mining operation's proximity to the Appalachian Trail, DENR initiated an investigation. Gardner traveled to the area on several occasions to view the mining site from the Appalachian Trail. Gardner testified that the mining operation was "clearly visible in good weather from [the Appalachian Trail] and particularly the portion of the [T]rail that goes down Hump Mountain toward the quarry." DENR also hired landscape and acoustical consultants to assess the situation. The site analysis submitted by the landscape architect reported that "[t]he Mine Site is visible from a substantial section of the [T]rail along Hump Mountain for a duration of approximately 20-25 minutes walking time. . . . The distance between the [T]rail at Hump Mountain and the mine site is approximately 2 miles." The analysis further found that "the visual prominence of the mine site as viewed from Little Hump Mountain appears almost equal in magnitude to that viewed from Hump Mountain." The distance between the Trail on Little Hump Mountain and the mining site is three miles. The analysis report noted that "[b]ased on the relationship of the Appalachian Trail to the Mine and the magnitude of the Phase I quarry operations, it would be diffi-

cult to meet" federal land management plan criteria for national forest properties.

Kathy Ludlow, a landscape architect and recreation analyst for the U.S. Forest Service, also prepared a scenery analysis of the mining operation. Ludlow testified that "the view from [that portion of the Trail on] Hump Mountain is an outstanding 360-degree panorama" with a "very natural-appearing landscape." Ludlow characterized the Hump Mountain site as an "important viewing location" given the large number of persons using that portion of the Appalachian Trail who have "high expectations for viewing natural-appearing scenery and attractive scenery." Further findings by Ludlow in her analysis included the following: (1) the proximity of the mining operation to the Appalachian Trail is less than three miles; (2) the duration of the direct view of the mining operation while walking along the Appalachian Trail on Hump Mountain is approximately twenty-five minutes; (3) the high quality of the view from Hump Mountain increases the duration of time spent by visitors at that particular portion of the Trail; and (4) the view of the mining site from the Appalachian Trail is "very clear" in good weather.

Dr. Noral D. Stewart, an acoustical consultant, provided an acoustical assessment of the impact of the mining operation on the Appalachian Trail. In his report, Dr. Stewart noted that "[t]he [T]rail location of primary concern is particularly unique. It is one of the few locations where there is a long unobstructed view from the [T]rail for a long walking distance along the [T]rail." Further, "the quiet mountain environment makes control of noise particularly difficult" and "means it is easier to hear a distant source." The report concluded that the mining site's "primary jaw-crusher is the major noise problem" and "would be noticed by and would likely be a major irritant to any hearing person walking the [T]rail."

On 28 February 2000, Gardner informed Paul Brown, president and stockholder of Petitioner company, that DENR would hold a public meeting concerning the mine. Approximately one hundred and fifty people attended the public hearing held on 16 March 2000. Petitioner presented information on its mining site and its effects on the Trail. Approximately thirty-one persons spoke on the subject of the mine, most in opposition thereto.

Over the next several weeks, DENR and Petitioner discussed proposed modifications to the mining permit conditions to mitigate the impact of the mine on the Appalachian Trail. On 19 April 2000, DENR

CLARK STONE CO. v. N.C. DEP'T OF ENV'T & NATURAL RES.

[164 N.C. App. 24 (2004)]

sent Petitioner a notice of its intent to revoke the mining permit unless an appropriate resolution of the problem could be found. DENR also advised Petitioner of its statutory right to an informal conference to discuss the matter. The informal conference was held 22 May 2000. During the conference, DENR requested that Petitioner submit a modification proposal, including a landscaping plan addressing the visual and acoustical impact of the mining operation on the Appalachian Trail.

Petitioner thereafter submitted proposed permit modifications and a landscape plan. Landscape architects in DENR's Division of Parks and Recreation reviewed the proposed landscape plan and determined that "little professional work [had] gone into [its] preparation." According to the architects, the proposed plan lacked the "requisites of [a] comprehensive planting plan" in that there was "no mention of soil preparation, species identification, design details, planting techniques, irrigation or general plant maintenance." Although the plan showed a "protective/visual screening buffer," it contained no "descriptive engineering or landscape data." Finally, the plan failed to develop "line-of-sight profiling between the quarry and surrounding viewpoints . . . to determine effective locations and heights of visual screens." They recommended that Petitioner "submit a plan that has been prepared by a professional landscape architectural firm which would have the expertise to do a comprehensive assessment of the visual impacts of [the mine] and determine what, if any, plantings or other landscape techniques would effectively mitigate those impacts."

Gardner informed Petitioner that its proposed landscape plan was inadequate and invited Petitioner to propose additional modifications by 4 August 2000. Gardner gave Petitioner a copy of the concerns and recommendations articulated by DENR's landscape architects. Petitioner requested an extension of time to submit a revised plan, stating that the landscape architect engaged by it was unable to do the work. DENR extended the deadline to 25 August 2000, at which time Petitioner submitted a one-page document entitled Supplemental Proposed Permit Modifications. The document was not prepared by a professional landscape architect and did not address the concerns raised by DENR's landscape architects. Four days later, DENR held a second public meeting to receive public comment on Petitioner's proposed modifications.

On 6 September 2000, DENR revoked Petitioner's permit on the grounds that the operation had a significantly adverse effect on the

Appalachian Trail in violation of the Mining Act. In its notice of revocation, DENR concluded that Petitioner's violation was willful, in that the mine was "so located and its operation . . . so designed that its ordinary operation as intended has had and would continue to have significant adverse effects, both visual and acoustical, on the purposes of the [Appalachian] Trail."

After reviewing the evidence submitted by the parties, the administrative law judge issued a recommended decision in favor of Petitioner's motion for summary judgment, concluding that DENR improperly revoked Petitioner's permit. The administrative law judge determined that, although DENR could properly *deny* an application for a mining permit if it found that the proposed operation would have a significantly adverse effect on a publicly owned park, forest or recreation area, it had no authority under the applicable statutes to *revoke* a permit on such grounds.

The matter came before the Mining Commission on 17 October 2001 for final agency decision. The Commission rejected the recommended decision of the administrative law judge, concluding that

> [i]n order to satisfy the agency's duty to uphold the Mining Act and the intent behind that statute, it is necessary for [DENR] to have the power to revoke the permit even after it was initially granted where the significant adverse effect created by the Mine did not become apparent to [DENR] until after the permit had been granted. To decide otherwise would render the permitting system contemplated by the Mining Act impotent, and would allow a permittee to escape regulation under the Act where new facts are discovered or conditions are changed.

Petitioner filed a petition for judicial review, which came before the trial court on 30 October 2002. The trial court reversed the Commission on the grounds that the decision upholding revocation of Petitioner's permit (1) violated Petitioner's constitutional rights; (2) exceeded DENR's statutory authority; (3) was made pursuant to unlawful procedure; (4) was affected by error of law; (5) was unsupported by substantial evidence in the whole record; and (6) was arbitrary and capricious. Respondents and Respondent-Intervenors appealed.

---

Respondents and Respondent-Intervenors contend the trial court erred in (I) applying the whole record test and determining that the Mining Commission's decision was unsupported by substantial evi-

dence; (II) concluding that DENR lacked authority under the General Statutes to revoke Petitioner's permit; (III) concluding that the revocation was made upon improper procedure; (IV) concluding that revocation was improper because it was not willful; and (V) concluding that the doctrine of vested rights prohibited revocation of Petitioner's permit. We determine first whether the trial court applied the appropriate standard of review; thereafter, we address these arguments in turn.

*Standard of Review*

[1] We review the trial court's reversal of a final agency decision to determine (1) whether the trial court exercised the appropriate standard of review; and (2) whether the trial court properly applied the standard of review. *Town of Wallace v. N.C. Dep't of Env't & Natural Res.*, 160 N.C. App. 49, 52, 584 S.E.2d 809, 812-13 (2003). Our scope of review is the same as that employed by the trial court. *Id.* at 52, 584 S.E.2d at 812. Under the General Statutes, the trial court may reverse or modify an agency's final decision if the substantial rights of the petitioners have been prejudiced because the agency's findings, inferences, conclusions, or decisions are: (1) in violation of constitutional provisions; (2) in excess of the statutory authority or jurisdiction of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) unsupported by substantial evidence in view of the entire record as submitted; or (6) arbitrary, capricious, or an abuse of discretion. *See* N.C. Gen. Stat. § 150B-51(b) (2001); *County of Wake v. N.C. Dep't of Env't & Natural Res.*, 155 N.C. App. 225, 233, 573 S.E.2d 572, 579 (2002), *disc. review denied*, 357 N.C. 62, 579 S.E.2d 387 (2003). Alleged errors of law, including questions of statutory interpretation by the agency, are reviewed *de novo* by the trial court. *See* N.C. Gen. Stat. § 150B-51(c) (2001); *Friends of Hatteras Island v. Coastal Resources Comm.*, 117 N.C. App. 556, 567, 452 S.E.2d 337, 344 (1995). Where an allegation is made that a final agency decision is not supported by competent evidence or is arbitrary and capricious, the trial court must review the decision under the whole record test. *See* N.C. Gen. Stat. § 150B-51(b)(5) (2001); *Walker v. N.C. Dept. of Human Resources*, 100 N.C. App. 498, 502, 397 S.E.2d 350, 354 (1990), *disc. review denied*, 328 N.C. 98, 402 S.E.2d 430 (1991). The whole record test requires the trial court to examine all of the evidence before the agency in order to determine whether the decision has a rational basis in the evidence. *Town of Wallace*, 160 N.C. App. at 54, 584 S.E.2d at 813. If the trial court concludes there is substantial competent evidence in the record to support the findings, the agency deci-

sion must stand. *Little v. Board of Dental Examiners*, 64 N.C. App. 67, 69, 306 S.E.2d 534, 536 (1983). The trial court may not weigh the evidence presented to the agency or substitute its own judgment for that of the agency. *King v. N.C. Environmental Mgmt. Comm.*, 112 N.C. App. 813, 817-18, 436 S.E.2d 865, 868 (1993).[1]

According to the trial court in the instant case, it reviewed *de novo* Petitioner's assertions that the final agency decision was in excess of statutory authority and made upon unlawful procedure, erroneous, and in excess of constitutional protections. The trial court applied the whole record test to Petitioner's assertions that the final agency decision was unsupported by substantial evidence and was arbitrary and capricious. These being the appropriate standards of review, we now must determine whether the trial court properly applied the standards.

## I. *Whole Record Test*

[2] Respondents and Respondent-Intervenors first argue the trial court erred in applying the whole record test and determining that the Commission's decision was unsupported by substantial evidence on the grounds that "there was no evidence heard on the issue of 'adverse effect' and no finding was made that [the mine] would constitute an 'adverse effect' on the Appalachian Trail." We agree that the trial court erred in applying the whole record test.

In the instant case, most of the findings made by the Commission were based on facts agreed upon and stipulated to by the parties. Contrary to the trial court's conclusion, Respondents presented substantial evidence that Petitioner's mining operations had a significant adverse impact on the Appalachian Trail. Gardner testified that the visibility of the mining site from that portion of the Trail on Hump Mountain had a "significant adverse impact on the [T]rail." The three analyses submitted by the consultants hired by DENR reported in detail the negative visual and acoustical impact of the mining site on the Appalachian Trail. The evidence submitted consistently demonstrated that the mining operation has a significantly adverse impact on the purposes of the Appalachian Trail. Petitioner submitted no evidence to the contrary; indeed, whether the mine has an adverse

---

1. Subsection (c) of N.C. Gen. Stat. § 150B-51 requires the reviewing court to engage in a *de novo* review of a final agency decision where the agency did not adopt the ALJ recommendation. This subsection was enacted in 2000 and is applicable to contested cases commenced on or after 1 January 2001. Because the contested case petition in the instant case was filed 10 October 2000, the standard of review articulated in subsection (c) does not apply.

impact on the Appalachian Trail does not appear to have been an issue of true dispute between the parties. In its motion for summary judgment, Petitioner contended DENR lacked authority to revoke the permit under the Mining Act, but made no argument concerning adverse impact. Because the findings by the agency were supported by substantial, uncontroverted evidence, the trial court erred in reversing the decision on the ground that it was unsupported by the evidence.

## II. *Authority to Revoke a Permit Under the Mining Act*

[3] Respondents contend the trial court erred in concluding that DENR lacked authority under the General Statutes to revoke Petitioner's permit. DENR revoked Petitioner's mining permit pursuant to the Mining Act of 1971, N.C. Gen. Stat. §§ 74-46 *et seq.* We therefore examine the relevant language and stated purpose of the Mining Act to determine DENR's authority under its provisions.

No mining may occur in the State unless pursuant to a valid operating permit issued by DENR. *See* N.C. Gen. Stat. § 74-50(a) (2003).

> The Mining Act clearly declares that [DENR] is vested with the authority to decide who will be granted mining permits in North Carolina. [DENR] also has the authority to condition a party's ability to mine on compliance with various requirements, and in doing so must attempt to protect the surrounding environment from potential hazards caused by specific projects.

*Martin Marietta Technologies v. Brunswick County*, 126 N.C. App. 806, 810, 487 S.E.2d 145, 147 (1997), *reversed on other grounds*, 348 N.C. 688, 500 S.E.2d 665 (1998).

DENR is authorized to deny an application for a mining operation permit upon finding:

> (1) That any requirement of [the Mining Act] or any rule promulgated hereunder will be violated by the proposed operation;
>
> (2) That the operation will have unduly adverse effects on potable groundwater supplies, wildlife, or fresh water, estuarine, or marine fisheries;
>
> (3) That the operation will violate standards of air quality, surface water quality, or groundwater quality that have been promulgated by [DENR];

(4) That the operation will constitute a direct and substantial physical hazard to public health and safety or to a neighboring dwelling house, school, church, hospital, commercial or industrial building, public road or other public property, excluding matters relating to use of a public road;

(5) That the operation will have a significantly adverse effect on the purposes of a publicly owned park, forest or recreation area;

(6) That previous experience with similar operations indicates a substantial possibility that the operation will result in substantial deposits of sediment in stream beds or lakes, landslides, or acid water pollution; or

(7) That the applicant or any parent, subsidiary, or other affiliate of the applicant or parent has not been in substantial compliance with [the Mining Act], rules adopted under [the Mining Act], or other laws or rules of this State for the protection of the environment or has not corrected all violations that the applicant or any parent, subsidiary, or other affiliate of the applicant or parent may have committed under [the Mining Act] or rules adopted under [the Mining Act] and that resulted in:

    a. Revocation of a permit,

    b. Forfeiture of part or all of a bond or other security,

    c. Conviction of a misdemeanor under G.S. 74-64,

    d. Any other court order issued under G.S. 74-64, or

    e. Final assessment of a civil penalty under G.S. 74-64.

N.C. Gen. Stat. § 74-51(d) (2003). Once issued, all permits are "expressly conditioned upon . . . any . . . reasonable and appropriate requirements and safeguards that [DENR] determines are necessary to assure that the operation will comply fully with the requirements and objectives of [the Mining Act]." N.C. Gen. Stat. § 74-51(f) (2003). For example, DENR may require an operator to install "visual screening, vegetative or otherwise, so as to screen the view of the operation from public highways, public parks, or residential areas, where [DENR] finds screening to be feasible and desirable." Id. If at any time after issuance of a permit, DENR determines that the mining activities under the permit "are failing to achieve the purposes and requirements of [the Mining Act]," DENR may modify the terms and conditions of the permit "as it deems appropriate." N.C. Gen. Stat.

§ 74-57 (2003). In doing so, DENR must give written notice to the operator of its intent to modify the permit, and inform the operator of the right to a hearing on the proposed modification. *See id.*

Whenever DENR has reason to believe that a mining operation violates (1) the Mining Act, (2) any rules adopted under the Mining Act, or (3) the terms and conditions of a permit, "it shall serve written notice of the apparent violation upon the operator, specifying the facts constituting the apparent violation and informing the operator of the operator's right to an informal conference with [DENR]." N.C. Gen. Stat. § 74-58(a) (2003). If the operator fails to appear at the informal conference, or if DENR following the informal conference finds there has been a violation, DENR "may suspend the permit until the violation is corrected or may revoke the permit where the violation appears to be willful." *Id.*

In the instant case, after issuing a mining permit to Petitioner, DENR determined that Petitioner's mining operation violated the Mining Act, in that it had a significant adverse effect on the purposes of the Appalachian Trail.[2] The trial court determined DENR lacked authority to revoke Petitioner's permit. The trial court reasoned that the grounds for denying a permit listed in section 74-51 of the General Statutes did not constitute violations of the Mining Act, and so concluded that, although DENR found the mining operation to have a significantly adverse effect on the Appalachian Trail, such a finding only supported initial denial of a permit and could not serve as a basis for revocation. We disagree with the trial court's interpretation of the Mining Act.

It is the function of the judiciary to construe a statute when the meaning of a statute is in doubt. *Sunscript Pharmacy Corp. v. N.C. Bd. of Pharmacy*, 147 N.C. App. 446, 452, 555 S.E.2d 629, 633 (2001), *disc. review denied*, 355 N.C. 292, 561 S.E.2d 506 (2002).

> In construing the laws creating and empowering administrative agencies, as in any area of law, the primary function of a court is to ensure that the purpose of the Legislature in enacting the law, sometimes referred to as legislative intent, is accomplished. The best indicia of that legislative purpose are "the lan-

---

2. In addition to its responsibilities in enforcing the Mining Act, DENR is statutorily required to "give due consideration to the conservation of the environment of the Appalachian Trail." N.C. Gen. Stat. § 113A-75(b) (2001); *see also* N.C. Gen. Stat. § 113A-73(a) (2001) (stating that the Appalachian Trail "should be protected in North Carolina as a segment of the National Scenic Trails System").

guage of the statute, the spirit of the act, and what the act seeks to accomplish."

*Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 399, 269 S.E.2d 547, 561 (1980) (citations omitted) (quoting *Stevenson v. City of Durham*, 281 N.C. 300, 303, 188 S.E.2d 281, 283 (1972)); *In re Declaratory Ruling by N.C. Comm'r of Ins.*, 134 N.C. App. 22, 27, 517 S.E.2d 134, 139, *disc. review denied*, 351 N.C. 105, 540 S.E.2d 356 (1999). The court "should be guided by the rules of construction that statutes *in pari materia*, and all parts thereof, should be construed together and compared with each other." *Comr. of Insurance*, 300 N.C. at 400, 269 S.E.2d at 561; *Redevelopment Commission v. Bank*, 252 N.C. 595, 610, 114 S.E.2d 688, 698 (1960). Thus, the court must reconcile such statutes with each other when possible, and resolve any irreconcilable ambiguity so as to effectuate the true legislative intent. *Comr. of Insurance*, 300 N.C. at 400, 269 S.E.2d at 561; *In re Declaratory Ruling*, 134 N.C. App. at 27, 517 S.E.2d at 139. Where, however, the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning. *State v. Green*, 348 N.C. 588, 596, 502 S.E.2d 819, 824 (1998), *cert. denied*, 525 U.S. 1111, 142 L. Ed. 2d 783 (1999).

Under section 74-58 of the North Carolina General Statutes, DENR must initiate suspension or revocation proceedings whenever it has reason to believe that a mining operation violates (1) the Mining Act, (2) any rules adopted under the Mining Act, or (3) the terms and conditions of a permit. *See* N.C. Gen. Stat. § 74-58(a) (stating that DENR "shall" serve written notice of the apparent violation). According to the plain language of section 74-58, a violation of the terms and conditions of a permit is separate and distinct from a violation of any rules adopted under the Mining Act or from a violation of the Mining Act itself. *See id.*; *see also* N.C. Gen. Stat. § 74-64(b) (2003) (distinguishing between violations of (1) the provisions of the Mining Act; (2) its rules; and (3) the terms and conditions of a permit). The question presented by the instant case is whether the grounds for denial of a permit as listed in section 74-51(d) may also serve as grounds for violation of the Mining Act. The Mining Act does not expressly define the term "violation" or specify what actions constitute a violation of the Mining Act. Such ambiguity requires this Court to examine the spirit of the Mining Act and what the legislation seeks to accomplish to determine the meaning of section 74-58. *See Sunscript Pharmacy Corp.*, 147 N.C. App. at 452-53, 555 S.E.2d at 633

(where the statutory language is ambiguous, the Court must look to the spirit and purpose of the legislation).

The Mining Act was enacted to ensure (1) "[t]hat the usefulness, productivity, and scenic values of all lands and waters involved in mining within the State will receive the greatest practical degree of protection and restoration" and (2) to prevent any mining "in the State unless plans for such mining include reasonable provisions for protection of the surrounding environment and for reclamation of the area of land affected by mining." N.C. Gen. Stat. § 74-48 (2003). In order to fulfill these purposes, the General Assembly charged DENR with the responsibility for enforcing the provisions of the Mining Act. *See* N.C. Gen. Stat. § 74-64 (2003). DENR may issue, condition, suspend, modify, renew, and revoke permits in its capacity as enforcer of the Mining Act. *See* N.C. Gen. Stat. § 74-51 *et seq*. DENR may deny a permit upon finding that the proposed operation "will have a significantly adverse effect on the purposes of a publicly owned park, forest or recreation area." N.C. Gen. Stat. § 74-51(d)(5).

The language and stated purposes of the Mining Act indicate that the General Assembly was concerned with the effect of mining on the State's environment. Section 74-51(d)(5) expresses the General Assembly's specific concern over the potential adverse effects of mining on the State's publicly owned parks, forests, and recreation areas. In light of the purpose of the Mining Act to provide "the greatest practical degree of protection and restoration" to the "scenic values of all lands and waters involved in mining with the State" in benefit of the "general welfare, health, safety, beauty, and property rights of the citizens," *see* N.C. Gen. Stat. § 74-47, we conclude, contrary to the decision of the trial court, that where a mining operation adversely affects the purposes of a publicly owned park, forest, or recreation area to a significant degree, such operation violates the Mining Act.

A contrary decision renders the protections of the Mining Act meaningless and contravenes the stated purposes of the legislation. As the Commission concluded, it is "inconceivable that the General Assembly would authorize [DENR] to deny a permit for a harm that was *predicted*, but provide no remedy where the harm was *actually found to occur*." According to the reasoning set forth by the trial court, any mistake by DENR in its initial permitting process, irrespective of due diligence by the agency, is simply not correctable, even where significant harm to the environment occurs. For example, if DENR issued a permit but later discovered that the operation of a

mine constituted "a direct and substantial physical hazard to public health and safety" under section 74-51(d)(4), DENR would have no authority, under the trial court's reasoning, to revoke the permit, even where modification of the permit was not possible and a substantial physical hazard to public health definitely proven. Following this reasoning, the illogical conclusion is that DENR would lack even the authority to deny *renewal* of such a permit. *See* N.C. Gen. Stat. § 74-52(b) (2003) (noting that the sole basis for denial of a renewal permit "shall be an uncorrected violation of the type listed in G.S. 74-51[(d)](7), or failure to submit an adequate reclamation plan"). Thus, under the trial court's narrow reading of section 74-58, a mining operation could pose a substantial physical hazard to public health and safety but continue to operate under a permit indefinitely. We reject such a narrow interpretation of section 74-58 and conclude the trial court erred in determining that DENR lacked authority to revoke Petitioner's permit on the basis of its finding that the operation had a significant adverse effect on the Appalachian Trail.

### III. *Proper Procedure for Revocation*

[4] Respondents further argue the trial court erred in concluding that revocation of Petitioner's permit was not made upon proper procedure. We agree. DENR notified Petitioner of the violation by letter dated 19 April 2000, and of its intent to revoke the permit unless sufficient modifications to mitigate the adverse effects could be taken. DENR also advised Petitioner of its statutory right to an informal conference to discuss the matter, which was held 22 May 2000. During the conference, DENR requested that Petitioner submit a modification proposal, including a landscaping plan addressing the visual and acoustical impact of the mining operation on the Appalachian Trail. Petitioner subsequently submitted two modification proposals, but DENR rejected both proposals because they did not adequately address the specific concerns raised by DENR. By letter dated 6 September 2000, DENR informed Petitioner that it was revoking the mining permit. The uncontroverted evidence shows that, once it determined that Petitioner's mining operation violated the Mining Act, DENR complied with the procedure set forth in section 74-58(a) of the General Statutes by (1) serving Petitioner with written notice of the violation; (2) informing Petitioner of its right to an informal conference; (3) holding an informal conference with Petitioner; (4) allowing Petitioner the opportunity to correct the violation; and (5) revoking Petitioner's permit after Petitioner failed to correct the violation. In so doing, DENR fulfilled its statu-

CLARK STONE CO. v. N.C. DEP'T OF ENV'T & NATURAL RES.

[164 N.C. App. 24 (2004)]

tory duties to both Petitioner and the people of North Carolina in revoking the permit.

Petitioner argues DENR should have proceeded under section 74-57 of the General Statutes, which allows DENR to modify the terms and conditions of a permit "as it deems appropriate." N.C. Gen. Stat. § 74-57. By failing to act pursuant to section 74-57, Petitioner asserts and the trial court concluded, that DENR's revocation was made upon improper procedure. We disagree. Certainly, DENR could have modified Petitioner's permit pursuant to section 74-57 had it so chosen, but it was under no statutory obligation to do so. Nothing in the Mining Act requires DENR to first modify a permit before initiating revocation proceedings. The trial court therefore erred in concluding that revocation of Petitioner's permit was made upon improper procedure.

## IV. *Willful Violation*

[5] By further assignment of error, Respondents contend the trial court erred in concluding that Petitioner's permit could not be revoked because any violation of the Mining Act was not "willful." The trial court concluded that there was "no deliberate act of Petitioner that has resulted in a violation of the permit[,]" and that there was "nothing 'willful' about the fact that the [mining operation] is visible from the Appalachian Trail." According to the trial court, there was "nothing correctable" about the violation, and thus no willful action on Petitioner's part. Again, we must disagree with the trial court.

Under section 74-58, DENR "may suspend the permit until the violation is corrected or may revoke the permit where the violation appears to be willful." N.C. Gen. Stat. § 74-58. After being put on notice that its operation violated the Mining Act, Petitioner took inadequate steps to properly and effectively address the violation, despite specific guidance by DENR on the issue. Contrary to the trial court's unsupported conclusion that there was "nothing correctable" about the violation, DENR twice advised Petitioner to employ a landscape architect in order to develop an effective modification proposal and landscaping plan. DENR related its specific concerns to Petitioner, and shared with Petitioner the results and proposals of the various consultants hired by DENR to review the effects of the mining site on the Appalachian Trail. All three of the reports submitted by the consultants contained concrete, detailed suggestions for mitigation of the visual and auditory impact of the mining site on the Trail.

Petitioner declined to employ a professional landscape architect, and its modification proposals did not significantly address the problems articulated by DENR. Had there indeed been "nothing correctable" about the violation, there would have been no reason for DENR to twice give Petitioner the opportunity to correct the violation by developing a professional landscaping plan to effectively address the adverse effects of the mining operation on the Appalachian Trail. DENR put Petitioner on notice of its violation and gave Petitioner the opportunity to correct the situation. Petitioner failed to act. Such failure cannot be described as anything other than willful. The trial court erred in concluding otherwise.

## V. *Vested Rights Doctrine*

[6] Finally, Respondent argues the trial court erred in concluding the doctrine of vested rights prohibited revocation of Petitioner's mining permit. Respondents contend the doctrine of vested rights does not protect Petitioner in the present case. We agree.

The doctrine of vested rights provides that

> one who, in good faith and in reliance upon a permit lawfully issued to him, makes expenditures or incurs contractual obligations, substantial in amount, incidental to or as part of the acquisition of the building site or the construction or equipment of the proposed building for the proposed use authorized by the permit, may not be deprived of his right to continue such construction and use by the revocation of such permit, whether the revocation be by the enactment of an otherwise valid zoning ordinance or by other means, and this is true irrespective of the fact that such expenditures and actions by the holder of the permit do not result in any visible change in the condition of the land.

*Town of Hillsborough v. Smith*, 276 N.C. 48, 55, 170 S.E.2d 904, 909 (1969). Here, the trial court concluded that, because Petitioner invested substantial expenditures in reliance upon the permit issued by DENR, it had acquired a "vested right to conduct mining operations at the site[.]" "One does not acquire a right to violate an otherwise valid zoning ordinance, already in existence," however, by "making expenditures or incurring obligations merely because when he made them he did not know the ordinance had been adopted." *Id.* at 58, 170 S.E.2d at 912. Here, no new law was enacted to alter the requirements of a mining permit. Rather, the permit was mistakenly issued in violation of the existing requirements of section 74-51(d)(5). Permits unlawfully or mistakenly issued do not create a vested right.

BENEFICIAL MTGE. CO. OF N.C., INC. v. BARRINGTON & JONES LAW FIRM, P.A.

[164 N.C. App. 41 (2004)]

*See Raleigh v. Fisher*, 232 N.C. 629, 635, 61 S.E.2d 897, 902 (1950); *Mecklenburg County v. Westbery*, 32 N.C. App. 630, 635, 233 S.E.2d 658, 660-61 (1977).

We also note that the issue of the permit's validity has been specifically and consistently challenged by Respondent-Intervenors, who argue Petitioner failed to give notice of its application for the permit to neighboring landowners, as required under section 74-50(b1) of the General Statutes. Without such notice, Respondent-Intervenors contend the permit was not valid. The trial court declined to address the issue, as it was not considered by the administrative law judge or the Commission. However, because the vested rights doctrine arises from a validly-issued permit only, it was error for the trial court to conclude that the doctrine protected Petitioner, where material issues of fact remained outstanding on the issue of notice. We conclude the trial court erred in determining that Petitioner had a vested right to operate its mine.

For the reasons stated herein, we conclude the trial court improperly applied the whole record test and erred in its interpretation of the Mining Act. The order of the trial court is therefore,

Reversed.

Judges McGEE and STEELMAN concur.