RUFUS STARK AND BETTY STARK, PETITIONERS

v.

N.C. DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, DIVISION OF LAND RESOURCES, HARRISON CONSTRUCTION, DIVISION OF APAC ATLANTIC, INC., AND THE NORTH CAROLINA MINING COMMISSION, RESPONDENTS

No. COA12-449

Filed 18 December 2012

**1. Witnesses—expert—not licensed**

The fact that a witness (Straw) at an administrative hearing concerning a mining dispute was neither a licensed engineer nor a licensed geologist did not render his expert testimony either "illegal" or inadmissible. In light of Straw's demonstrated expertise in the study of ground vibration and its effect on structures, his expert testimony was properly admitted.

**2. Administrative Law—contested case hearing—mining permit—misrepresentation—not relevant**

Evidence regarding alleged misrepresentations by defendant Harrison Construction to petitioners and a county manager during a prior mining permit action was not relevant to the Division of Land Resources' (DLR's) consideration of the permit denial criteria in this case and was properly excluded.

**3. Administrative Law—mining permit—findings—supported by evidence—not arbitrary**

A Division of Land Resources (DLR) decision to issue a permit for the expansion of a quarry was supported by substantial, competent evidence and was not arbitrary or capricious. DLR found none of the seven statutory criteria for denial, found that any adverse effects would be mitigated by defendant Harrison Construction, and was required by statute to issue the permit.

**4. Appeal and Error—preservation of issues—brief—incorporation of arguments by reference—dismissed**

Petitioners' attempt to "incorporate by reference" a multitude of arguments and challenges to findings was dismissed. The Court of Appeals' scope of review is limited to those issues for which argument and authority are presented within the appellate brief.

Appeal by petitioners from order entered 28 September 2011 by Judge James U. Downs in Clay County Superior Court. Heard in the Court of Appeals 27 September 2012.

*Stark Law Group, PLLC, by Thomas H. Stark, for petitioner appellants.*

*Attorney General Roy Cooper, by Assistant Attorneys General Sueanna P. Sumpter, Rufus Allen, and Special Deputy Attorney General Kathryn Jones Cooper, for the North Carolina Department of Environment and Natural Resources, Division of Land Resources, and the North Carolina Mining Commission respondent appellees.*

*Roberts & Stevens, PA, by William Clarke; and Deborah Murphey, for Harrison Construction, Division of APAC Atlantic, Inc., respondent appellee.*

McCULLOUGH, Judge.

Rufus Stark and Betty Stark ("petitioners") appeal from an order of the trial court affirming the Final Agency Decision of the North Carolina Mining Commission (the "Mining Commission"). We affirm.

## I. Background

Respondent Harrison Construction, Division of APAC Atlantic, Inc. ("Harrison"), holds Mining Permit No. 22-06, authorizing opera-

tion of a crushed stone quarry known as the Hayesville Quarry in Clay County, North Carolina. The Hayesville Quarry is located in the vicinity of Shewbird Mountain. Harrison's permit was issued by respondent North Carolina Department of Environment and Natural Resources ("DENR"), Division of Land Resources ("DLR"), in 1989 and renewed by DLR in 1999. On 5 January 2007, Harrison applied for a major modification to its permit, seeking to add 37 acres to its previously permitted acreage and, within the proposed permit boundary, to increase the area disturbed by its mining operations by 22.1 acres.

Upon receipt of Harrison's application for modification, DLR routed the application to multiple state and federal agencies for review and comment, including the Asheville Regional Office of DENR's Divisions of Air Quality and Water Quality, the North Carolina Wildlife Resources Commission, the United States Fish and Wildlife Service, DENR's Division of Parks and Recreation, the State Historic Preservation Office's Division of Historical Resources, and DLR's North Carolina Geological Survey Section, as specified in N.C. Gen. Stat. § 74-50(b3) (2011). Upon receipt of written comments from those agencies, any concerns expressed were investigated by DLR and, where appropriate, additional information was requested from Harrison.

On 17 January 2007, Harrison sent notice of its application for modification to adjoining landowners of record. On 14 March 2007, James Simons, Director of DLR ("Simons"), determined that significant public interest concerning Harrison's permit modification application warranted a public hearing in the matter. Petitioners attended the public hearing conducted on 2 April 2007 and both submitted written comments and made an oral presentation at the public hearing. Petitioners subsequently forwarded additional written comments to DLR following the hearing.

Petitioners reside on a 32-acre tract of land located on the south face of Shewbird Mountain. Their property adjoins that of Harrison, with a common property line of approximately 1500 feet. Petitioners' home is approximately 300 feet from that line.

At the public hearing, petitioners described cracks in the foundation of their home and the worsening of cracks in the tile floor of their home. They also indicated a window in their home had been displaced in its frame and they had replaced four large windows whose vacuum seal had been "compromised." Petitioners also stated the following concerns in their written comments expressing opposition to

modification of the permit: the operation would have an adverse impact on water supply wells in the area and decrease the flow and quality of surface waters; it would destroy plants and animal habitats in the area of the proposed expansion; it would present a physical hazard to petitioners' home; it would have an adverse impact on publicly owned parks and recreation areas, as Shewbird Mountain is visible from various points in the area; and blasting would threaten the stability of rock outcroppings above their home. Prior to the 2 April 2007 public hearing concerning the subject permit modification application, petitioners had not made any complaints to DLR about Harrison's mining operation.

After hearing and considering the concerns of petitioners and various other attendees at the public hearing, on 27 April 2007, DLR sent Harrison a letter in which it requested the applicant submit additional information and studies. Specifically, Harrison was asked, *inter alia*, 1) to address screening of the mining operation from public view; 2) to obtain a groundwater study evaluating possible impacts of the proposed quarry expansion on water supply wells on the north, east, and south sides of Shewbird Mountain; and 3) to obtain a blasting study to determine if expansion of the quarry could occur as proposed with blasting levels remaining below the permit limits at the closest occupied dwelling and without mobilizing existing old debris slides on the east side of the mountain. In response to DLR's 27 April 2007 request for additional information, Harrison submitted a letter addressing the information requested along with a groundwater evaluation completed by Geological Resources, Inc. and a blasting evaluation completed by GeoSonics Inc. ("GeoSonics").

In determining whether to approve the proposed permit modification, Simons considered the application and all relevant materials in light of the denial criteria set forth under N.C. Gen. Stat. § 74-51(d) (2011). Following that review, on 18 January 2008, DLR approved the requested modification to Harrison's mining permit.

On 21 February 2008, petitioners initiated a contested case in the North Carolina Office of Administrative Hearings ("OAH") to challenge DLR's 18 January 2008 decision to approve Harrison's permit modification. A hearing was held before an Administrative Law Judge ("ALJ") on 12-14 October 2009. At the contested case hearing, petitioners presented evidence to the effect that as of January 2008, their home had sustained some cracks in the foundation and in the tile floor. The cracks in the tile floor were present when petitioners moved into the home in 2001 but had lengthened recently. Petitioner

Rufus Stark painted the foundation of the home in 2001 and did not notice any cracks at that time.

Petitioners also presented the testimony of two expert witnesses: Stephen Blevins ("Blevins"), who testified as an expert in the fields of blasting, geology, and professional engineering regarding soils and materials; and Bernard Feinberg ("Feinberg"), who testified as an expert in the fields of structural engineering and blasting. Blevins was retained by petitioners to review the GeoSonics blasting evaluation and comment upon it. Feinberg was retained by petitioners to visit their home and observe various defects at the residence. In addition, the ALJ heard testimony by Simons as to DLR's review of each of the statutory denial criteria set forth under N.C. Gen. Stat. § 74-51(d), as well as testimony by Jeffrey Straw ("Straw"), who testified as an expert in the field of ground vibration and acoustics analysis and its effect on structures; Straw also had prepared the GeoSonics blasting evaluation. On 28 January 2010, the ALJ entered a decision affirming DLR's decision to approve the permit modification.

The matter was then heard before the Mining Commission on 15 June 2010. Prior to the hearing, the parties were allowed to submit exceptions to the ALJ's decision and written arguments for consideration. At the hearing, the parties were also allowed to present oral arguments. Following deliberations, the Mining Commission voted to adopt the decision of the ALJ. The Final Agency Decision was signed on 8 July 2010 and served upon the parties.

On 6 August 2010, petitioners commenced an action in superior court seeking judicial review of the Mining Commission's Final Agency Decision. The matter was heard by the trial court on 28 December 2010, and on 28 September 2011, the trial court entered an order affirming the Mining Commission's Final Agency Decision in its entirety. Petitioners now appeal from the trial court's order affirming the Mining Commission's Final Agency Decision.

## II. Standards of Review

Pursuant to N.C. Gen. Stat. § 74-61 (2011):

> An applicant, permittee, or affected person may contest a decision of [DENR] to deny, suspend, modify, or revoke a permit or a reclamation plan . . . by filing a petition for a contested case under G.S. 150B-23 within 30 days after [DENR] makes the decision. Article 4 of

Chapter 150B of the General Statutes governs judicial review of a decision of the Commission.

*Id.* N.C. Gen. Stat. § 150B-51(b) (2011) provides:

The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:

(1)   In violation of constitutional provisions;

(2)   In excess of the statutory authority or jurisdiction of the agency or administrative law judge;

(3)   Made upon unlawful procedure;

(4)   Affected by other error of law;

(5)   Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or

(6)   Arbitrary, capricious, or an abuse of discretion.

*Id.* "On judicial review of an administrative agency's final decision, the substantive nature of each [asserted error] dictates the standard of review." *N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 658, 599 S.E.2d 888, 894 (2004); *see also* N.C. Gen. Stat. § 150B-51(c); *Utilities Comm. v. Bird Oil Co.*, 302 N.C. 14, 21, 273 S.E.2d 232, 236 (1981) ("The nature of the contended error dictates the applicable scope of review."). "[E]rrors of law are reviewed *de novo*, while the whole record test is applied to allegations that the administrative agency decision was not supported by the evidence, or was arbitrary and capricious." *Sack v. N.C. State Univ.*, 155 N.C. App. 484, 491, 574 S.E.2d 120, 126 (2002).

"*De novo* review requires a court to consider the question anew, as if the agency has not addressed it." *Blalock v. N.C. Dep't of Health and Human Servs.*, 143 N.C. App. 470, 475-76, 546 S.E.2d 177, 182 (2001).

The whole record test requires the trial court to examine all of the evidence before the agency in order to determine whether the decision has a rational basis in

the evidence. If the trial court concludes there is sub-
stantial competent evidence in the record to support the
findings, the agency decision must stand. The trial court
may not weigh the evidence presented to the agency or
substitute its own judgment for that of the agency.

*Clark Stone Co. v. N.C. Dep't of Env't & Natural Res.*, 164 N.C. App.
24, 31-32, 594 S.E.2d 832, 837 (2004) (citations omitted). "Rather, a
court must examine all the record evidence—that which detracts
from the agency's findings and conclusions as well as that which
tends to support them—to determine whether there is substantial evi-
dence to justify the agency's decision." *Carroll*, 358 N.C. at 660, 599
S.E.2d at 895 (internal quotation marks and citations omitted).
"Substantial evidence is relevant evidence a reasonable mind might
accept as adequate to support a conclusion." *Id.* (internal quotation
marks and citations omitted).

### III. Admission of Expert Testimony

**[1]** In their first argument on appeal, petitioners argue that the supe-
rior court erred in rejecting their arguments challenging the
admissibility of Straw's expert testimony. Petitioners also presented
arguments challenging the admissibility of the GeoSonics blasting
evaluation prepared by Straw. However, it appears from the record
that the GeoSonics blasting evaluation was both introduced and
admitted at the hearing as a joint exhibit of the parties without objec-
tion by petitioners. Thus, any error in admitting the GeoSonics blast-
ing evaluation was invited error, about which petitioners cannot now
complain on appeal. *Frugard v. Pritchard*, 338 N.C. 508, 512, 450
S.E.2d 744, 746 (1994) ("A party may not complain of an action which
he induced."). Thus, we will review petitioners' argument only as it
pertains to Straw's expert testimony presented at the hearing. The
appropriate standard of review for evidentiary issues on appeal from
a final agency decision is *de novo. Sack*, 155 N.C. App. at 493, 574
S.E.2d at 127.

At the contested case hearing, Straw testified that he was asked
by Harrison to visit the Hayesville Quarry and prepare a blasting eval-
uation to determine the effects of ground vibration and air blast on
structures and on the stability of slopes in the area. Straw testified
that he visited the Hayesville Quarry on 10 September 2007, during
which time he toured the entire operation, viewed the areas where
the operator had blasted, traveled to the site where Harrison pro-
posed to blast, toured the neighboring community, and visited peti-

tioners' residence. Straw testified he was provided with seismograph recording information for the period January 2005 through 21 June 2007, wave form recordings, velocity levels and air overpressure information, and individual blast logs.

Based upon the individual blast logs produced by Harrison's independent blasting contractor, Straw developed a table that detailed generally the blasting procedures used by Harrison at the Hayesville Quarry. Straw also input the data provided into a spreadsheet for use in conjunction with a program developed from regression evaluation formulas of the United States Bureau of Mines designed to evaluate ground vibration levels generated by blasting. Straw then completed a regression analysis using this software. The regression analysis produced a range within which ground vibration was expected to fall. After completing the regression analysis, Straw concluded that the blasting limits established in the permit modification approved by DLR for the Hayesville Quarry were sufficient to prevent damage to the nearest structure adjacent to it.

Straw further testified that he evaluated offsite slope stability as related to ground vibration levels. Straw testified that he reviewed technical literature addressing this issue, which indicated that ground vibration levels of between one and four inches per second would be required to cause movement of loose slope areas. Straw testified he also looked for evidence of past slide activity on the quarry property and on petitioners' property, but his observations of petitioners' property and on his drive around the mountain did not indicate any active unstable areas. Based upon his research and site visit, and comparing the projections made with the levels necessary to cause slope slides, Straw concluded that the ground vibration would be considerably less than that required to cause a slide to occur.

Petitioners argue on appeal that Straw's expert testimony was inadmissible because practice in his field of expertise requires either an engineering license or a license to practice geology. Accordingly, petitioners contend Straw's testimony was "illegal" and his credentials were therefore inadequate, requiring exclusion of his testimony.

"The trial court has broad discretion in the determination and admission of expert testimony." *State v. East*, 345 N.C. 535, 550, 481 S.E.2d 652, 662 (1997). "The decision to qualify a witness as an expert is ordinarily within the exclusive province of the trial judge or hearing officer." *State ex rel. Comr. of Insurance v. N.C. Rate Bureau*, 75 N.C. App. 201, 230, 331 S.E.2d 124, 144 (1985); *see also Maloney v.*

*Hospital Systems*, 45 N.C. App. 172, 179, 262 S.E.2d 680, 684 (1980) (noting "the trial court's decision concerning whether or not a witness has qualified as an expert is ordinarily within the court's sound discretion"). "A finding by the trial court that the witness is qualified will not be reversed unless there was no competent evidence to support it or the court abused its discretion." *State v. Love*, 100 N.C. App. 226, 232, 395 S.E.2d 429, 433 (1990).

The admissibility of expert testimony is governed by Rule 702 of the North Carolina Rules of Evidence, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion[.]

N.C. Gen. Stat. § 8C-1, Rule 702(a) (2011). In *Maloney v. Hospital Systems*, 45 N.C. App. 172, 262 S.E.2d 680 (1980), this Court "accept [ed] the principle that the giving of expert testimony should not be limited to those witnesses who are licensed in some particular field of endeavor, nor limited by whether such witnesses employ their skills professionally or commercially[.]" *Id.* at 178, 262 S.E.2d at 684. Subsequently, our Supreme Court noted:

> " 'It is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist, licensed, or even engaged in a specific profession.' *State v. Evangelista*, 319 N.C. 152, 164, 353 S.E.2d 375, 384 (1987). 'It is enough that the expert witness "because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." ' *Id.* at 164, 353 S.E.2d at 384 (quoting *State v. Wilkerson*, 295 N.C. 559, 569, 247 S.E.2d 905, 911 (1978))."

*East*, 345 N.C. at 550, 481 S.E.2d at 662 (quoting *State v. Goode*, 341 N.C. 513, 529, 461 S.E.2d 631, 640-41 (1995)). Other cases from both this Court and our Supreme Court have continued to reiterate that "[t]o qualify as an expert, one need not be a specialist or have a license from an examining board or be engaged in any particular profession. As long as study, experience, or both makes the witness better qualified than the jury to draw appropriate inferences from the facts, he may be qualified as an expert." *Love*, 100 N.C. App. at 232, 395 S.E.2d at 433; *see also Williams v. CSX Transp., Inc.*, 176 N.C.

App. 330, 340, 626 S.E.2d 716, 725 (2006) ("Expert testimony is not 'limited to those witnesses who are licensed in some particular field of endeavor, nor limited by whether such witnesses employ their skills professionally or commercially.' " (quoting *Maloney*, 45 N.C. App. at 178, 262 S.E.2d at 684)).

Prior to giving the challenged testimony, Straw testified that he held a Bachelor of Science Degree in environmental science and that he has completed professional training and course work in the areas of vibration and acoustics, airport noise modeling, and explosives. Straw testified that he was currently serving as vice president and area manager of the Florida Office for GeoSonics, and he had worked for GeoSonics and its predecessor company for 31 years. Straw testified that GeoSonics operates to determine the effects on structures from blasting activities in the construction and mining industries, to complete traffic vibration studies, and to evaluate the effects of implosion upon structures. Straw stated that in working for GeoSonics, he had monitored ground vibration and air overpressure produced by blasting activities at quarries, completed noise evaluations for quarries, completed preconstruction or preblast inspections for mining operations, and performed projections of future blasts based upon existing data. Straw testified that he, like the other individuals employed by GeoSonics, is an "applied seismologist" who studies either manmade or natural ground vibration and air overpressure levels caused by blasting activities and other sources. Specifically, Straw stated that he takes measurements and relates the information collected to determine the effects of those parameters upon adjacent structures. Straw further stated that he maintained responsibilities for GeoSonics' Raleigh, North Carolina, office and that he had previously testified in North Carolina as an expert on the effects of ground vibration caused by blasting.

Given these credentials, we discern no abuse of discretion by the ALJ in admitting Straw's expert testimony. We are not persuaded by petitioners' argument that Straw, in preparing the report for Harrison and in testifying as to his conclusions in the report, was illegally engaged in the practice of engineering or geology. Numerous statutes regulate the practice of various professions in this State. *See, e.g.*, N.C. Gen. Stat. Ch. 87 (Contractors), Ch. 88B (Cosmetic Art), Ch. 89C (Engineering and Land Surveying), Ch. 89E (Geologists), Ch. 90 (Medicine and Allied Occupations), Ch. 90B (Social Workers). The overarching purpose of these statutes is to protect the public from incompetent persons purporting to practice a given profession. *See*,

*e.g., Ron Medlin Constr. v. Harris*, 364 N.C. 577, 586, 704 S.E.2d 486, 492 (2010) ("The purpose of the licensing statutes is to protect consumers from incompetent contractors."); *Bryan Builders Supply v. Midyette*, 274 N.C. 264, 270, 162 S.E.2d 507, 510-11 (1968) ("The purpose of Article 1 of Chapter 87 of the General Statutes, which prohibits any contractor who has not passed an examination and secured a license as therein provided from undertaking to construct a building costing $20,000.00 or more, is to protect the public from incompetent builders."); *McArver v. Gerukos*, 265 N.C. 413, 416, 144 S.E.2d 277, 280 (1965) (purpose of statute requiring licensure of real estate brokers and real estate salesmen is to "protect sellers, purchasers, lessors and lessees of real property from fraudulent or incompetent brokers and salesmen"). The fact that a professional is or is not "practicing a given profession" does not hinder his ability to testify as an expert in most instances. Indeed, the Legislature has undertaken to specify when testimony by a licensed professional is required. *See, e.g.*, N.C. Gen. Stat. § 8C-1, Rule 702(b) (licensed physician required to testify as to the appropriate standard of health care in medical malpractice actions).

Rather, our Courts have upheld a trial court's or administrative law judge's decision to qualify an expert on a particular subject, despite that the expert is not "licensed" pursuant to statute. In *Kenney v. Medlin Construction & Realty*, 68 N.C. App. 339, 315 S.E.2d 311 (1984), this Court found no abuse of discretion in the trial court's determination that a contractor

> who had been involved in building more than 200 residences, including eight to twelve in plaintiff's subdivision, was an expert, better qualified than the jury to form an opinion as to the quality of workmanship and damage resulting from the construction of plaintiff's house. *That [the contractor] was not a licensed contractor does not render his opinion testimony inadmissible.*

*Id.* at 342-43, 315 S.E.2d at 314 (emphasis added); *see also Rutherford v. Air Conditioning Co.*, 38 N.C. App. 630, 641-42, 248 S.E.2d 887, 895 (1978) (upholding expert opinion testimony by electrical engineering professor). In *State v. White*, 340 N.C. 264, 457 S.E.2d 841 (1995), our Supreme Court likewise held that "[n]urses are qualified to render expert opinions as to the cause of a physical injury even though they are not licensed to diagnose illnesses or prescribe treatment, and

there is no basis for any preference of licensed physicians for such medical testimony." *Id.* at 294, 457 S.E.2d at 858.

Accordingly, we agree with this Court's reasoning in *Maloney*, 45 N.C. App. 172, 262 S.E.2d 680:

> The common law . . . does not require that the expert witness on a medical subject shall be a person *duly licensed to practice medicine* . . . . Except as an indirect stimulus to obtain a license, such a rule is ill-advised, first, because the line between chemistry, biology, and medicine is too indefinite to admit of a practicable separation of topics and witnesses, and, secondly, because some of the most capable investigators have probably not needed or cared to obtain a license to practice medicine.

*Id.* at 178, 262 S.E.2d at 683-84 (ellipses in original) (citation omitted). In accordance with this rationale, the law in this state does not require a testifying scientific expert to be a person duly licensed to practice in a particular field. Indeed, petitioners' own expert, Blevins, a licensed professional engineer in North Carolina, testified that he was unaware of any requirement that a blasting analysis be performed by, certified by, or completed under the direction of a licensed engineer.

We conclude likewise and hold that the fact that Straw was neither a licensed engineer nor a licensed geologist did not render his expert testimony either "illegal" or inadmissible, and, in light of Straw's demonstrated expertise in the study of ground vibration and its effect on structures, Straw's expert testimony was properly admitted. Petitioners' argument on this issue, therefore, is without merit. Although petitioners also attempt to argue that Straw's testimony must be excluded on the basis that his methodology was unreliable, this argument is not properly before this Court and was abandoned by petitioners, as they did not present such an argument to the court below and appear to have actually conceded this issue at the contested case hearing.

## IV. Exclusion of Evidence

[2] In their second argument on appeal, petitioners argue the trial court erred in rejecting their arguments regarding certain evidentiary rulings made by the ALJ. Evidentiary issues are reviewed *de novo* on appeal from a final agency decision. *Sack*, 155 N.C. App. at 493, 574 S.E.2d at 127-28.

First, petitioners contend they should have been allowed to present evidence of alleged communications between representatives of Harrison and the county manager in 1989 and between representatives of Harrison and petitioners in 1999. Petitioners assert that in both instances, representatives of Harrison made assurances that the mining operation would not expand beyond the limits established in prior permitting proceedings. Petitioners argue such evidence was relevant to DLR's consideration of the permitting denial criteria set forth under N.C. Gen. Stat. § 74-51(d).

However, none of the seven denial criteria address the existence, enforcement, or consideration of private agreements between a permittee and adjacent landowners or other private individuals concerning the permittee's plans for expansion of its mining operation. To the extent petitioners contend such assurances or misrepresentations violate N.C. Gen. Stat. § 74-64(b) (2011), thereby implicating denial criterion seven, their arguments are misguided. Denial criterion seven allows DLR to deny a permit modification if the applicant has not been in substantial compliance with the Mining Act or any rules adopted thereunder, and such noncompliance resulted in, *inter alia*, "[c]onviction of a misdemeanor under G.S. 74-64." N.C. Gen. Stat. § 74-51(d)(7)(c). N.C. Gen. Stat. § 74-64(b) imposes a criminal penalty upon "any operator who engages in mining in willful violation of the provisions of [the Mining Act] or of any rules promulgated hereunder or *who willfully misrepresents any fact in any action taken pursuant to this Article or willfully gives false information in any application or report required by this Article*[.] *Id.* (emphasis added). Harrison's alleged misrepresentations to petitioners and to the county manager are not equivalent to a misrepresentation to DLR in its actions to seek, modify, or renew its permit under the Mining Act. Moreover, denial criterion seven requires a "[c]onviction" under this statute. Petitioners' evidence does not demonstrate a criminal violation of the Mining Act, nor a conviction therefor. Accordingly, petitioners' evidence regarding these alleged misrepresentations by Harrison representatives was not relevant to DLR's consideration of the denial criteria and was properly excluded.

**[3]** Second, petitioners argue they should have been allowed to introduce evidence concerning Harrison's history of Mining Act violations, which petitioners argue likewise implicates review criterion seven.

However, petitioners have not demonstrated that the list of violations they sought to introduce into evidence are pertinent to review

criterion seven. In order for review criterion seven to be implicated, the evidence must show:

> That the applicant or any parent, subsidiary, or other affiliate of the applicant or parent has not been in substantial compliance with this Article, rules adopted under this Article, or other laws or rules of this State for the protection of the environment or has not corrected all violations that the applicant or any parent, subsidiary, or other affiliate of the applicant or parent may have committed under this Article or rules adopted under this Article and that resulted in [revocation of a permit; forfeiture of part or all of a bond or other security; or monetary fines, conviction of a misdemeanor, or any other court ordered action under N.C. Gen. Stat. § 74-64].

N.C. Gen. Stat. § 74-51(d)(7). The evidence offered by petitioners does not demonstrate a lack of "substantial compliance" over the lifetime of Harrison's mining operation, nor does the evidence show that Harrison failed to correct any of the violations alleged. Notably, the record demonstrates Harrison's mining operation has not suffered any of the penalties specified in review criterion seven as a result of petitioners' alleged violations. We also note that certain evidence of Harrison's violations, including sedimentation in a nearby lake and a complaint regarding Harrison's blasting was received into the record and considered by the ALJ. Thus, we conclude petitioners' argument is without merit.

Third, petitioners argue they were not allowed to present seismograph readings recorded at their residence following DLR's approval of Harrison's permit modification in January 2008. However, we conclude such evidence was properly excluded, as it neither was relevant to a review of the correctness of DLR's decision to approve the permit modification nor demonstrated a violation of the blasting limits established in the permit. In addition, the evidence was cumulative of other evidence presented by petitioners.

Here, Harrison placed a seismograph on petitioners' property for the purpose of recording and monitoring the vibration levels resulting from its mining operations. Petitioner Rufus Stark testified at the hearing that the seismograph produced a reading after every blast. All readings recorded by the seismograph prior to DLR's approval of Harrison's permit modification were admitted into evidence.

However, those readings taken after DLR's approval of Harrison's permit modification were excluded on the basis that such evidence was not relevant to a review of the propriety of DLR's decision to approve the permit modification. We agree.

Petitioners initiated the contested case hearing below pursuant to N.C. Gen. Stat. § 74-61, which allows an "affected person" to contest DLR's decision to "deny, suspend, modify, or revoke a permit[.]" *Id.* We fail to see how evidence that came into existence after DLR had made its contested decision is relevant to a review of the propriety of DLR's actions in approving the permit modification.

In support of their argument that such evidence was properly admissible at the contested case hearing, petitioners rely on this Court's opinion in *Robinson v. DHHS*, ___ N.C. App. ___, 715 S.E.2d 569 (2011). In *Robinson*, the petitioner, Robinson, a mentally and physically disabled man, was denied the level of Medicaid coverage requested by his case manager by the respondent Department of Health and Human Services ("DHHS"). *Id.* at ___, 715 S.E.2d at 569-70. Accordingly, Robinson appealed the agency's decision to the OAH and a contested case hearing was held. *Id.* at ___, 715 S.E.2d at 570. At the hearing, Robinson presented testimony by his treating physician and an evaluating psychologist, both of whom supported the level of Medicaid coverage requested in Robinson's case plan. *Id.* However, such evidence had not been presented to or considered by the agency before making its initial decision to modify and reduce Robinson's services. *Id.*

On appeal, this Court held that the administrative law judge could properly admit Robinson's evidence, having found "no . . . regulation in the Medicaid context which would prohibit the ALJ from considering additional evidence regarding a petitioner's medical needs." *Id.* at ___, 715 S.E.2d at 572. Indeed, the Court in *Robinson* recognized that the General Assembly had recently enacted a provision expressly allowing for the consideration of additional evidence in contested Medicaid cases, although we note that this provision did not apply in the *Robinson* decision. *Id.* at ___ n.3, 715 S.E.2d at 572 n.3. In addition, this Court supported its decision in *Robinson* with the policy rationale that, in contested Medicaid cases, disallowing a petitioner to present additional evidence at a contested case hearing would "deny Medicaid recipients meaningful input at any stage of the process[.]" *Id.* at ___, 715 S.E.2d at 572 (internal quotation marks omitted). This Court reasoned:

Prior to its initial decision, the agency only requests documents from a Medicaid recipient's case manager. Therefore, any failure to submit the relevant medical evidence necessary to support the case plan would be on the part of the case manager, who is also an agent of the State. Thus, if a recipient is barred from presenting additional evidence to the ALJ during a contested hearing, there is no way to remedy any deficiencies in the presentation of his case plan and to have a meaningful opportunity to be heard.

*Id.*

We conclude the *Robinson* decision is readily distinguishable on its facts, and its holding is therefore inapplicable to the facts of the present case. *Robinson* was decided in the context of contested Medicaid cases in which a petitioner is afforded no input during the process until initiating a contested case hearing. Here, however, prior to DLR's decision to approve Harrison's permit modification under the Mining Act, petitioners had ample opportunity to participate, and did in fact participate, in DLR's permitting review process. Petitioners attended the public hearing in this matter at which they presented their concerns regarding the damage to their home resulting from Harrison's blasting at the Hayesville Quarry, and petitioners likewise presented written comments concerning the same to DLR following the public hearing. In addition, petitioners had the opportunity to present evidence addressing the correctness of DLR's decision to issue the permit modification based on circumstances existing before or at the time of the agency decision. Petitioners therefore had a meaningful opportunity to participate in the agency's decision-making process and to present evidence on their own behalf prior to the agency's determination to approve the permit modification. Thus, petitioners' reliance on *Robinson* in support of their argument in the present case is misplaced.

Petitioners also rely on this Court's decision in *Clark Stone Co. v. N.C. Dep't of Env't & Natural Res.*, 164 N.C. App. 24, 594 S.E.2d 832 (2004), in support of their argument that post-permit evidence is admissible in a contested case hearing under the Mining Act. Again, however, petitioners' reliance on the decision in Clark Stone is misguided, as the decision in *Clark Stone* is distinguishable on its facts. In *Clark Stone*, DENR had issued a mining permit to the petitioner, Clark Stone Co., to conduct mining operations on land in Avery County, North Carolina. *Id.* at 27, 594 S.E.2d at 834. However, follow-

ing the issuance of the permit, DENR became aware that the mining operation was within visual and audible range of the Appalachian Trail. *Id.* After learning of the mining operation's proximity to the Appalachian Trail, DENR initiated an investigation into the matter. *Id.* As a result of its post-permit investigation, DENR decided to revoke the petitioner's permit on the grounds that the mining operation had a significantly adverse effect on the Appalachian Trail in violation of the Mining Act. *Id.* at 29-30, 594 S.E.2d at 836. Accordingly, Clark Stone Co. filed a petition for a contested case hearing to review DENR's decision. *Id.* at 26, 594 S.E.2d at 834.

We first note that no issue concerning the reception of post-permit evidence was raised on appeal in *Clark Stone,* and therefore, the opinion contains no holding directly on point. In addition, to the extent petitioners rely on *Clark Stone* because post-permit evidence was received at the contested case hearing in that case, the decision being reviewed in *Clark Stone* was markedly different from the decision being reviewed in the present case. The issue in *Clark Stone* was whether DENR improperly revoked the mining permit at issue. The revocation necessarily was based on evidence discovered after the initial issuance of the permit, during DENR's post-permit investigation, and was therefore relevant to review of the agency decision at issue. Such is not the case here. Here, the issue concerns the correctness of the issuance of the permit in the first instance. Thus, unlike *Clark Stone,* evidence collected after the permit modification was issued is not relevant to a review of the agency's decision.

Further, the record indicates petitioners' excluded evidence was cumulative of other evidence admitted at the contested case hearing. Petitioners' evidence concerning the seismograph readings in the present case appear to have been introduced to rebut and/or discredit Straw's projections concerning the range of expected ground vibration levels. Specifically, based on his regression analysis, Straw concluded that for 95% of blasts with an explosives weight of 327 pounds, ground vibration would be less than .303 inches per second. Petitioners' seismograph readings, taken after DLR's approval of Harrison's permit modification, tended to show occasions where Straw's projections had been exceeded. Nonetheless, Blevins testified that on two occasions, prior to the issuance of the permit modification, he found Straw's predictions had been exceeded. Thus, the seismograph readings showing more occurrences of what Blevins had already testified to were merely cumulative and would not have significantly strengthened petitioners' contentions.

Finally, petitioners have presented no argument that the seismograph readings demonstrate the blasting limits established in the permit modification approved by DLR, which petitioners have not challenged on appeal, were exceeded by Harrison, thereby demonstrating a violation of the Mining Act. We note that the provisions of the Mining Act in no way "restrict or impair the right of any private or public person . . . to bring any legal or equitable action for redress against nuisances or hazards." N.C. Gen. Stat. § 74-66 (2011). Although petitioners' post-permit seismographic evidence is not relevant to a review of the correctness of the agency decision at issue in the present case, such evidence may be more appropriately introduced in a private action for relief. Thus, we hold petitioners' proffered evidence was properly excluded from the contested case hearing.

## V. Review of Agency Decision

[3] Finally, petitioners argue that "unrebutted" evidence presented at the hearing establishes that Harrison's application for modification should have been denied based on multiple review criteria. Accordingly, petitioners contend the agency's decision is unsupported by substantial evidence in the record and is arbitrary and capricious. We review petitioners' final argument challenging the agency's decision under the whole record test. N.C. Gen. Stat. § 150B-51(c).

Pursuant to the terms of the Mining Act, "[a]n operating permit may be modified from time to time to include land neighboring the affected land, in accordance with procedures set forth in G.S. 74-52." N.C. Gen. Stat. § 74-50(a) (2011). Under N.C. Gen. Stat. § 74-52 (2011), the terms and conditions of a permit may be modified "only where the Department determines that the permit as modified would meet all requirements of G.S. 74-50 and [G.S.] 74-51." *Id.* § 74-52(c) (alteration in original).

Upon review of a permit application or application for permit modification, DLR considers the seven denial criteria enumerated under N.C. Gen. Stat. § 74-51(d):

(d)  The Department may deny the permit upon finding:

(1)  That any requirement of this Article or any rule promulgated hereunder will be violated by the proposed operation;

(2) That the operation will have unduly adverse effects on potable groundwater supplies, wildlife, or fresh water, estuarine, or marine fisheries;

(3) That the operation will violate standards of air quality, surface water quality, or groundwater quality that have been promulgated by the Department;

(4) That the operation will constitute a direct and substantial physical hazard to public health and safety or to a neighboring dwelling house, school, church, hospital, commercial or industrial building, public road or other public property, excluding matters relating to use of a public road;

(5) That the operation will have a significantly adverse effect on the purposes of a publicly owned park, forest or recreation area;

(6) That previous experience with similar operations indicates a substantial possibility that the operation will result in substantial deposits of sediment in stream beds or lakes, landslides, or acid water pollution; or

(7) That the applicant or any parent, subsidiary, or other affiliate of the applicant or parent has not been in substantial compliance with this Article, rules adopted under this Article, or other laws or rules of this State for the protection of the environment or has not corrected all violations that the applicant or any parent, subsidiary, or other affiliate of the applicant or parent may have committed under this Article or rules adopted under this Article and that resulted in:

   a. Revocation of a permit,

   b. Forfeiture of part or all of a bond or other security,

   c. Conviction of a misdemeanor under G.S. 74-64,

   d. Any other court order issued under G.S. 74-64, or

   e. Final assessment of a civil penalty under G.S. 74-64.

*Id.* Notably, N.C. Gen. Stat. § 74-51(e) provides: "In the absence of any finding set out in subsection (d) of this section, or if adverse effects

are mitigated by the applicant as determined necessary by the Department, a permit *shall* be granted." *Id.* (emphasis added).

Petitioners premise their arguments on a construction of the statute that where "unrebutted evidence" implicates any of the seven denial criteria, such evidence "require[s] denial of a permit." Petitioners' construction of the statute is entirely inconsistent with its literal language. Rather, the statute plainly states that DLR "may" deny a permit upon a finding that any of the seven criteria are met. However, DLR is required to issue the permit if it makes no finding that any of the seven criteria are implicated or if DLR finds that any such implicated criteria can and will be mitigated by the applicant. Here, DLR found none of the seven criteria are implicated, and that, to the extent any of the criteria are implicated, any adverse effects will be mitigated by Harrison as required under the terms of the permit modification.

Nonetheless, petitioners argue their evidence unequivocally indicates that criteria one, two, four, five, six, and seven were violated, and therefore, the permit modification should not have been granted.

Regarding criterion one, petitioners argue removing the mountain top and destabilizing mountain slopes violate the Mining Act's stated purposes. The Mining Act provides that its purposes are to provide:

(1) That the usefulness, productivity, and scenic values of all lands and waters involved in mining within the State will receive the greatest practical degree of protection and restoration.

(2) That from June 11, 1971, no mining shall be carried on in the State unless plans for such mining include reasonable provisions for protection of the surrounding environment and for reclamation of the area of land affected by mining.

N.C. Gen. Stat. § 74-48 (2011). Petitioners have not shown that an adequate reclamation plan is not in place to restore the land in compliance with the Act, and there is no evidence in the record indicating that an adequate reclamation plan was not considered by DLR. Thus, petitioners' argument as to this criterion is without merit.

Regarding criterion two, petitioners argue the lay testimony of petitioner Rufus Stark established that there is decreased wildlife in the area as a result of Harrison's mining operation. However, petitioners ignore that both the U.S. Fish and Wildlife Service and the

N.C. Wildlife Resources Commission had no objections to the permit modification based upon any threats to wildlife. Specifically, the U.S. Fish and Wildlife Service informed DLR of its opinion that the proposed permit modification would not have any adverse effect on federally listed species. The only concerns raised by the U.S. Fish and Wildlife Service, as well as the N.C. Wildlife Resources Commission, addressed the parameters of the reclamation plan. The record evidence shows these concerns were addressed through revisions to the reclamation plan. Thus, petitioners' argument as to this criterion is without merit.

Regarding criterion four, petitioners argue that their expert, Feinberg, provided the only competent evidence concerning the damaging effects of Harrison's blasting to their home and that Feinberg's testimony established that Harrison's blasting is causing structural damage to their home. Specifically, Feinberg testified that he had visited petitioners' home and had observed various defects at the residence. Feinberg testified that, in his opinion, cracks he observed in the tile floor of petitioners' home were "due to movement" and that it was "possible that [the cracks were] caused by the effects of blasting." Feinberg also testified that he observed separation of the windows on petitioners' home and opined that such separation was "caused by blasting damage" because he "couldn't explain the separation in any other way." Feinberg stated that he felt "very strongly" that the cracks in the tile floor had been caused by Harrison's blasting and that other cracks observed around the home could have been "aggravated" by the blasting. However, Feinberg later testified that it was "possible" that the damage observed could have been the result of causes other than blasting. Moreover, Feinberg testified that none of the damage he observed at petitioners' residence currently posed a threat to the structural integrity of the home. Notably, criterion four requires evidence of a "direct and substantial physical hazard" to the home. Further, petitioners' other expert, Blevins, as well as Straw, testified that the blasting limits established in the permit modification were conservative limits consistent with the standards adopted by the U.S. Bureau of Mines and are generally considered to be protective of adjacent structures. Simons testified that DLR included the most stringent limits within the permit modification so as to protect the nearest structure, petitioners' home, from damage. Furthermore, the record shows DLR incorporated certain operating conditions into the permit modification to minimize any potential structural damage that might result from blasting. In light of the evidence as a whole, petitioners' argument as to this criterion must fail.

Regarding criterion five, petitioners argue Simons' testimony established that Harrison's mining operation diminished the scenic value of the public parks in the area. However, there is no evidence in the record demonstrating that the "purposes" of these public parks or their use and enjoyment are affected by Harrison's blasting. In addition, the record evidence indicates that Harrison proposed, and DLR accepted Harrison's proposal as sufficient, to establish a tree line in order to minimize any scenic effects resulting from the mining operation. Further, the record discloses there is no audible noise resulting from the blasting that can be heard at the public parks in question. These facts are readily distinguishable from those in *Clark Stone*, on which petitioners' rely, where the purpose of the Appalachian Trail, the public park area at issue in that case, was to provide a pristine wilderness experience and the mining operation at issue was within both visual and audible proximity to the Trail. *Clark Stone*, 164 N.C. App. at 27, 32-33, 594 S.E.2d at 834, 837-38. Thus, petitioners' argument as to this criterion is without merit.

Regarding criterion six, petitioners argue Simons' testimony likewise established that the groundwater flow will be affected by Harrison's blasting activities and that no examination of the effect on groundwater resulting from Harrison's mining operation was presented by Harrison or DLR at the contested case hearing. To the contrary, however, DLR incorporated operating conditions into the permit modification requiring efforts by Harrison to mitigate any groundwater concerns, consistent with the Mining Act. In addition, a groundwater evaluation provided by Geological Resources, Inc. indicated no significant adverse impact on groundwater resulting from Harrison's mining operation. Thus, petitioners' argument as to this criterion is without merit. Petitioners' remaining argument as to criterion seven is likewise without merit, as the record clearly discloses no prior mining violations by Harrison that resulted in any of the measures detailed under that criterion.

Accordingly, based on our review of the entire record in this case, we conclude the agency's decision was supported by substantial, competent evidence and was not arbitrary or capricious. Rather, as the ALJ properly concluded:

> A preponderance of the evidence presented in this matter indicates that [DLR]'s decision to issue the subject permit modification was made after due consideration of the statutory factors set forth in N.C. Gen. Stat. § 74-51 and was correct and proper. The

respondent did not act outside its authority, act erroneously, act arbitrarily or capriciously, use improper procedure, or fail to act as required by law or rule in approving [Harrison]'s application for modification of the mining permit.

Thus, we affirm the trial court's order affirming the agency's decision upholding DLR's decision to approve Harrison's permit modification.

[4] Finally, we note that, although petitioners attempt to "incorporate by reference" a multitude of arguments and challenges to findings of fact made in their petition for judicial review below, we dismiss any such arguments. Our scope of review on appeal is limited only to those issues for which argument and authority are presented within the appellate brief. N.C. R. App. P. 28(a) (2012); *see Fortner v. J.K. Holding Co.*, 319 N.C. 640, 641-42, 357 S.E.2d 167, 167-68 (1987); *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 615-16, 659 S.E.2d 442, 453 (2008).

## VI. Conclusion

We hold Straw's expert testimony was properly admissible in the present case, as Rule 702 does not require a testifying scientific expert to hold a license to practice a given profession in order for his expert testimony to be admissible. In light of Straw's demonstrated expertise in the study of ground vibration and its effect on structures, Straw's expert testimony was properly admitted under Rule 702 at the contested case hearing. In addition, we hold petitioners' excluded evidence concerning Harrison's alleged misrepresentations and Mining Act violations, as well as the seismograph readings taken after DLR approved Harrison's permit modification, were not relevant to a review of the propriety of the agency's decision and were properly excluded. We further hold that the record demonstrates that the agency's decision was supported by substantial, competent evidence and was not arbitrary or capricious. Accordingly, we affirm the trial court's order affirming the Final Agency Decision of the Mining Commission in the present case.

Affirmed.

Judges HUNTER, JR. (Robert N.) and ERVIN concur.